IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
ENTERED

NOV 3 0 2004

Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| THEODORE GOYNES, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. H-02-2665 |
| DOUG DRETKE, Director, | § | |
| Texas Department of Criminal | § | |
| Justice-Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

Petitioner Theodore Goynes seeks a writ of habeas corpus under 28 U.S.C. § 2254, challenging his state court conviction and death sentence for capital murder. Respondent Doug Dretke has filed a motion for summary judgment. Having carefully considered the petition, the summary judgment motion, the state court record, the parties' submissions, and the applicable law, this court will grant in part and deny in part respondent's motion for summary judgment and will grant in part and deny in part Goynes' petition for writ of habeas corpus, entering final judgment by separate order. The reasons for these rulings are set out in detail below.

### I.  Background

The facts of the crime are undisputed. On October 6, 1990, Goynes followed Linda Marie Tucker as she left a convenience

store.[1]  As Tucker opened her car door, Goynes shoved her into the car, pushed the front seat forward, and got into the back seat. Tucker screamed and briefly struggled, but became cooperative when she saw that Goynes had a gun.  Goynes ordered Tucker to drive away and held her with one arm while holding a gun to her head with the other arm.

A witness followed the car but lost sight of it when she saw a policeman and went to inform him of the abduction.  Another witness also followed Tucker's car but stopped when she saw the car turn onto a side street.  Several witnesses testified that they saw Goynes standing outside on the unlit side of the convenience store before the abduction, and they noted that he walked to a lamppost in the parking lot from time to time.  One witness identified Goynes as a friend of his uncle whom he met a few times before. The witness noted that Goynes was wearing a jacket with the words "Forest Brook" on the back.

Tucker's family was informed of the abduction.  The family, volunteers, and police began searching for Tucker.  At about 1:00 a.m. the following day a wrecker reported finding Tucker's car in an abandoned apartment complex.  A short time later police discovered Tucker's body on a staircase with a gunshot wound to the head.

---

[1]The facts are taken largely from the opinion of the Texas Court of Criminal Appeals on Goynes' direct appeal.  Where this court's statement of facts diverges from that of the Texas Court of Criminal Appeals, this opinion cites to the record.

Police obtained a warrant for Goynes' arrest. When the police arrived at his apartment, Goynes was not there, but the police found a jacket with the words "Forest Brook" on the back and a bloodstained rug. Pursuant to a search warrant, the police searched Goynes' room and found a box containing a pair of gloves, a revolver with six live rounds of ammunition, and a six-round "bullet holder" with five live rounds. The bullet removed from Tucker's head was fired from the revolver found in Goynes' room.

On October 9, 1990, Goynes was inadvertently found by police answering a disturbance call. After his arrest Goynes confessed to abducting and murdering Tucker.

In addition to the evidence establishing the crime, the state presented the following evidence at the trial of Goynes. Houston Police Department ("HPD") Sergeant J.H. "Johnny" Moore accompanied Goynes to court for his magistrate warnings after Goynes' arrest. Moore later advised Goynes of his <u>Miranda</u> rights and interviewed him. Moore testified that Goynes followed instructions, did not behave abnormally, and appeared to understand his <u>Miranda</u> rights. 29 Tr. at 146-63.

Dr. Boris Rubashkin, a psychiatrist, treated Goynes at the Harris County Jail after Goynes' arrest. Dr. Rubashkin testified that Goynes was not mentally ill during the time he treated Goynes. He also noted that he began treating Goynes three days after the murder, that serious mental illness does not develop in three days,

-3-

and therefore concluded that Goynes was not mentally ill on the day of the murder.  32 Tr. at 4-11.

Dr. Jerome B. Brown is a psychiatrist who examined Goynes to determine his competence to stand trial and his sanity.  Brown noted that although Goynes possesses borderline intelligence, he is not mentally retarded.  Goynes is schizophrenic and suffered cognitive dysfunctions, but Dr. Brown concluded that he was legally sane.

Dr. Brown also noted that schizophrenia often inhibits a person's ability to interact with others and can adversely affect the ability to organize thoughts and ideas.  These problems can be aggravated by stress.  Brown also observed that Goynes has trouble processing verbal information and making rational decisions based on verbal information due to his low verbal IQ.  Goynes would have been unable to understand everything occurring at trial and would have trouble assisting his attorneys.  Goynes was also unable to understand complex questions, and was less able than most people to challenge authority.  Id. at 28-80.  Dr. Brown also concluded, however, that Goynes understood his Miranda rights.  35 Tr. at 48-50.

Dr. James Ray Hays, a psychologist and professor at the University of Texas Medical School, testified for the defense. Dr. Hays conducted several psychological tests on Goynes. Based on these tests Dr. Hays concluded that Goynes has borderline

-4-

intellectual functioning, with a full-scale IQ of 77.  That score places Goynes in about the sixth percentile for intelligence. Goynes' verbal IQ was only 68, placing Goynes in the second percentile.  Dr. Hays characterized this as "mentally defective." Because of his low verbal IQ, Goynes was unable to understand and utilize verbal information or to interact with people who operate on a more verbal level.  Dr. Hays acknowledged that Goynes understood that he was on trial for capital murder, was facing the death penalty, and knew who the lawyers, judge, and jury were; but he lacked the capacity to understand more than the most simple, concrete, concepts.  33 Tr. at 5-20.

Dr. Hays noted that Goynes was unable to deal effectively with information.  When being questioned by the police Goynes would have been able to answer questions he understood, but would not have understood complex questions, especially those with multiple parts. Goynes also has significant memory deficits.  Dr. Hays testified that Goynes was unable to process, understand, and remember Miranda warnings, even if they were given numerous times.  Goynes functions intellectually at about a third-grade level.  He is also very prone to following the lead of authority figures, such as police officers.  Id. at 20-67.

Dr. Al Yanovitz teaches in a program for speech language pathologists and audiologists at the University of New England in Maine.  He reviewed and transcribed a tape of Goynes'

interrogation. Dr. Yanovitz concluded that there were several differences between what Goynes actually said, and what the police transcript of the interview said. First, Yanovitz noted that the police officer asked multiple questions without pausing to allow Goynes to answer. Yanovitz found that the officer asked a total of 293 questions and failed to pause 82 times. Yanovitz stated that the tape revealed several types of cognitive dysfunction which indicate that Goynes did not understand the nature of his rights or the conversation he was having with the officer. Id. at 129-205.

The State called Dr. Elizabeth Heynen as a rebuttal witness. Dr. Heynen is Supervisor of Psychologists at Vernon State Hospital. She evaluated Goynes and agreed that he is of borderline intelligence, but concluded that he was capable of understanding and waiving his Miranda rights. 35 Tr. at 4-13. Goynes was found guilty of capital murder on December 9, 1991.

During the penalty phase the State presented evidence of Goynes' prior convictions for rape, sodomy, burglary with intent to commit rape, arson, and assault to murder with malice aforethought. One of the victims of these crimes also testified that Goynes broke into her apartment, raped her at gunpoint, stabbed her in the neck, bound her, and set her bed on fire. Another victim also testified that Goynes raped her at gunpoint. A third victim testified that Goynes raped her at knife point. 38 Tr. at 8-77. Yet another victim testified that Goynes abducted her at gunpoint from a

-6-

shopping center and raped and beat her, causing severe injuries. Id. at 151-79.   The State also presented evidence that Goynes previously served time in an Illinois penitentiary.   Id. at 91-98.

Goynes' mother, Jo Nell Johnson, testified that Goynes was "slow" as a child, and dropped out of school after third grade. Goynes' father was physically abusive, and Johnson and her children left him when Goynes was about five years old.   About a year later Goynes' father took the children back.   Johnson got the children back, but her husband again took them, this time permanently.   Id. at 201-11.

A psychiatrist, Dr. Jaime Ganc, also testified for Goynes. Dr. Ganc evaluated Goynes before trial and found that Goynes had borderline intelligence but was competent to stand trial.   He concluded that Goynes suffered severe neglect and possibly abuse from both parents when he was a child, and this neglect and abuse caused anger and hostility.   Due to Goynes' low intelligence, he does not know how to express or cope with his anger.   Because of his very low verbal ability, he is unable to understand his anger. Dr. Ganc observed that people with Goynes' intellectual limitations often react to everyday life by acting out violently.   Goynes is also a follower because of his need for acceptance.   Dr. Ganc noted an incident from Goynes' childhood in which Goynes engaged in sexual conduct with some other boys because it was so important to Goynes to be accepted.   Dr. Ganc was of the opinion that Goynes

-7-

could do well in a structured environment like prison.  Id. at 215-36.

The jury returned positive findings on the special issues, and Goynes was sentenced to death on December 11, 1991.  The Texas Court of Criminal Appeals affirmed the conviction and sentence in an unpublished opinion.  Goynes v. State, No. 71,387 (Tex. Crim. App. Dec. 14, 1994).  The United States Supreme Court denied certiorari on June 26, 1995.  Goynes v. Texas, 515 U.S. 1165 (1995).

Goynes filed an application for state habeas corpus relief on October 24, 1997.  I SH. at 58.[2]  The trial court entered findings of fact and conclusions of law recommending that the application be denied, II SH. at 369-97, and the Texas Court of Criminal Appeals denied relief, Ex parte Goynes, No. 52,487-01 (Tex. Crim. App. June 26, 2002).  Goynes filed a preliminary petition for federal habeas corpus relief on July 15, 2002, and supplemented that petition on July 31, 2003.  Goynes' supplemental petition raises nine claims for relief.  Goynes contends that he was denied due process because he was incompetent to stand trial and because the trial court failed to conduct a sua sponte inquiry into his competence;  his appellate counsel rendered ineffective assistance by failing to raise the issue of the trial court's failure to

_____

[2]"SH." refers to the transcript of Goynes' state habeas corpus proceeding.

-8-

conduct a <u>sua sponte</u> inquiry into Goynes' competence; the special issues presented to the jury during the penalty phase of Goynes' trial did not allow the jury to consider and give effect to Goynes' mitigating evidence; his confession was the product of an involuntary and uncounseled confession; and trial counsel rendered ineffective assistance by failing to develop evidence that Goynes suffers from organic brain damage for use in mitigation of sentence and in challenging the voluntariness of his confession.   Dretke argues that some of these claims are procedurally defaulted and that Goynes is not entitled to relief on any of his claims.

## II.  <u>The Applicable Legal Standards</u>

**A.   The Antiterrorism and Effective Death Penalty Act**

This federal petition for habeas relief is governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which became effective April 24, 1996.  <u>See</u> <u>Lindh v. Murphy</u>, 521 U.S. 320, 335-36 (1997).  Under the AEDPA federal habeas relief based on claims that were adjudicated on the merits by the state courts cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d); <u>Kitchens v. Johnson</u>, 190 F.3d 698, 700 (5th Cir. 1999).

For questions of law or mixed questions of law and fact adjudicated on the merits in state court, this court may grant federal habeas relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent]." See Martin v. Cain, 246 F.3d 471, 475 (5th Cir.), cert. denied, 534 U.S. 885 (2001). Under the "contrary to" clause, this court may afford habeas relief only if "'the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than . . . [the Supreme Court] has on a set of materially indistinguishable facts.'" Dowthitt v. Johnson, 230 F.3d 733, 740-41 (5th Cir. 2000), cert. denied, 532 U.S. 915 (2001) (quoting Williams v. Taylor, 529 U.S. 362, 406 (2000)).

The "unreasonable application" standard permits federal habeas relief only if a state court decision "identifies the correct governing legal rule from [the Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Williams, 529 U.S. at 406. "In applying this standard, we must decide (1) what was the decision of the state courts with regard to the questions

-10-

before us and (2) whether there is any established federal law, as explicated by the Supreme Court, with which the state court decision conflicts." Hoover v. Johnson, 193 F.3d 366, 368 (5th Cir. 1999). A federal court's "focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." Neal v. Puckett, 239 F.3d 683, 696 (5th Cir. 2001), aff'd, 286 F.3d 230 (5th Cir. 2002) (en banc), cert. denied sub nom. Neal v. Epps, 537 U.S. 1104 (2003). The solitary inquiry for a federal court under the 'unreasonable application' prong becomes "whether the state court's determination is 'at least minimally consistent with the facts and circumstances of the case.'" Id. (quoting Hennon v. Cooper, 109 F.3d 330, 335 (7th Cir. 1997)); see also Gardner v. Johnson, 247 F.3d 551, 560 (5th Cir. 2001) ("Even though we cannot reverse a decision merely because we would reach a different outcome, we must reverse when we conclude that the state court decision applies the correct legal rule to a given set of facts in a manner that is so patently incorrect as to be 'unreasonable.'").

The AEDPA precludes federal habeas relief on factual issues unless the state court's adjudication of the merits was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See 28 U.S.C.

§ 2254(d)(2); <u>Hill v. Johnson</u>, 210 F.3d 481, 485 (5th Cir. 2000), <u>cert.</u> <u>denied</u>, 532 U.S. 1039 (2001).   The state court's factual determinations are presumed correct unless rebutted by "clear and convincing evidence."   28 U.S.C. § 2254(e)(1); <u>see also</u> <u>Jackson v.</u> <u>Anderson</u>, 112 F.3d 823, 824-25 (5th Cir. 1997), <u>cert.</u> <u>denied</u>, 522 U.S. 1119 (1998).

**B.   The Standard for Summary Judgment in Habeas Corpus Cases**

"As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases."   <u>Clark v. Johnson</u>, 202 F.3d 760, 764 (5th Cir.), <u>cert.</u> <u>denied</u>, 531 U.S. 831 (2000).   Insofar as they are consistent with established habeas practice and procedure, the Federal Rules of Civil Procedure apply to habeas cases.   <u>See</u> Rule 11 of the Rules Governing Section 2254 Cases.   In ordinary civil cases a district court considering a motion for summary judgment is required to construe the facts in the case in the light most favorable to the nonmoving party.   <u>See</u> <u>Anderson v. Liberty</u> <u>Lobby</u>, 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").   Where, however, a state prisoner's factual allega-tions have been adversely resolved by express or implicit findings of the state courts, and the prisoner fails to demonstrate by clear and convincing evidence that the presumption of correctness

established by 28 U.S.C. § 2254(e)(1) should not apply, it is not appropriate for the facts of a case to be resolved in the petitioner's favor.  See Marshall v. Lonberger, 459 U.S. 422, 432 (1983); Sumner v. Mata, 449 U.S. 539, 547 (1981).  In reviewing factual determinations of the Texas state courts, this court is bound by such findings unless an exception to 28 U.S.C. § 2254 is shown.

### III.  Analysis

#### A.    Competence

In his first two grounds for relief Goynes argues that he was denied due process of law because he was incompetent to stand trial, and that the trial court erred in not sua sponte ordering an examination into Goynes' competence.  Goynes cites the following evidence in support of these claims.

Beginning at age 13 he was committed to the Texas Youth Commission and scored a 65 on the Wechsler Intelligence Scale for Children.  38 Tr. at 314, 44 Tr. at Def. Exh. 40.  From the ages of 16 to 18 he was committed to a state hospital in Illinois where he again scored 65 on an IQ test.  The Illinois Department of Mental Health identified him as retarded and testing suggested mild to moderate brain damage.  38 Tr. at 213, 44 Tr. at Def. Exh. 41.

Goynes was imprisoned in Texas from 1974 to 1988.  During this time he was regularly prescribed anti-psychotic medication, was

diagnosed as schizophrenic, and was classified as having borderline intellectual functioning.   He was charged with burglary of a habitation in April of 1989.   In July of 1989 Goynes was determined to be incompetent and ordered to a state hospital for psychiatric observation.   Hospital records reflect that Goynes reported auditory hallucinations and was diagnosed as paranoid schizophrenic. 32 Tr. at 36, 41 Tr. at 69, Def. Exh. 15.

The Tucker murder occurred in October of 1990.   On October 10, 1991, while in custody for this murder, Goynes underwent psychiatric screening.   At that time he was taking the anti-psychotic medications Thorazine, Meldareel, and Cogentin.   Goynes was evaluated by Dr. Jaime Ganc.   Dr. Ganc noted that Goynes suffered auditory hallucinations and possibly suffered from a schizoid personality disorder.

Following a motion by trial counsel for psychiatric observation Goynes was admitted to Vernon State Hospital in July of 1991. Dr. D.F. Martinez, a staff psychiatrist, diagnosed Goynes as suffering from chronic paranoid schizophrenia.   Goynes scored a 72 full scale IQ, consisting of a verbal IQ of 66 and a performance IQ of 81.   On the Wide Range Achievement Test Goynes scored at or below a third-grade level.

During the state post-conviction proceedings an investigator interviewed Goynes four times.   He found that Goynes did not spontaneously offer information and responded to questions with a

-14-

"yes," "no," or shrug of the shoulders. Goynes did not answer in complete sentences and was not able to explain his interactions with trial counsel or details of his case. Affidavit of Gerald Bierbaum, Pet. Exh. 4.

Goynes was also examined by Dr. Robert Moorecook, a licensed psychologist. Dr. Moorecook's testing corroborated trial testimony establishing Goynes' borderline intellectual functioning and low verbal IQ. Pet. Exh. 5.

In sum, the evidence adduced at trial and during post-conviction proceedings establishes that Goynes has a lengthy history of mental illness, borderline intellectual functioning, significant impairments in his ability to understand and utilize verbal information, and short-term memory deficits. The state habeas court denied Goynes' request for an evidentiary hearing on this issue and denied relief.

The state habeas court found that Goynes was able to communicate with his lawyers, and that Dr. Martinez and Dr. Elizabeth Heynen found that he was competent to stand trial. SH. at 371-373. The court also found that defense expert, Dr. Hays, testified about Goynes' ability to understand his <u>Miranda</u> warnings rather than his ability to assist counsel, and trial counsel admitted he could not offer concrete evidence that Goynes was incompetent. The habeas court rejected the credibility of trial counsels' affidavits alleging Goynes' incompetence "based on

the almost six year delay in coming forward . . . and based upon the fact that such information conflicts with counsel's contemporaneous representations to the trial court . . . ."  Those evaluations, which concluded that Goynes was incompetent, all occurred several years after trial.  Accordingly, the state habeas court rejected Goynes' claim.  SH. at 370-82.

This court granted funds for Goynes to retain neuropsychologist Dr. Stephen Martin.  Dr. Martin examined Goynes on July 18, 2003, and submits an affidavit stating the results of his testing and examination.  Dr. Martin found diffuse organic brain damage to the frontal lobes of Goynes' brain.  This damage causes impairment to Goynes' auditory attention, verbal memory, visual processing speed, psycho-motor problem solving, language skills, visual spatial processing, visual memory, incidental memory, sensory motor abilities, and intellectual abilities.  These deficits impact Goynes' ability to understand and relate to the outside world on a verbal level.  Dr. Martin notes that Goynes has trouble retaining verbal information and is slow to formulate verbal responses.  Pet. Exh. 7.

1.    <u>Competence to Stand Trial</u>

Due process prohibits the conviction of a person who is incompetent to stand trial.  <u>Cooper v. Oklahoma</u>, 517 U.S. 348 (1996); <u>Pate v. Robinson</u>, 383 U.S. 375, 378 (1966).  A defendant is

-16-

competent to stand trial if he has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the proceedings against him." Godinez v. Moran, 509 U.S. 389, 396 (1993) (quoting Dusky v. United States, 362 U.S. 402, 402 (1960) (per curiam)). He must also be able "to assist in preparing his defense. . . ." Drope v. Missouri, 420 U.S. 162, 171 (1975). "To obtain habeas relief based on incompetency in fact, [Goynes] must show that the facts are sufficient to positively, unequivocally and clearly generate a real, substantial and legitimate doubt as to his mental competency at the time of trial." Dunn v. Johnson, 162 F.3d 302, 306 (5th Cir. 1998), cert. denied, 526 U.S. 1092 (1999) (internal quotation marks omitted).

The state court's factual findings and conclusion are reasonable and entitled to deference. At best, the evidence establishes that Goynes has difficulty communicating and utilizing verbal information. The evidence does not demonstrate that he was so utterly unable to communicate with his lawyers as to render him incompetent to stand trial. There is no dispute that Goynes was able to understand the facts underlying his conviction, and that he understood that he was on trial and that he faced the death penalty. While he may have lacked a grasp of many of the subtleties of the process, that is a far cry from being unable to "consult with his lawyer with a reasonable degree of rational

understanding."   Although Dr. Martin's evaluation raises some additional questions about Goynes' competence, the fact remains that Goynes underwent a competency evaluation shortly before trial and was found competent to stand trial.  The state court's finding was not unreasonable, even considering Dr. Martin's newly-offered opinion, in light of the evidence of a contemporaneous finding that Goynes was competent.  Therefore, Goynes is not entitled to relief on this claim.

### 2.   *Sua Sponte* Hearing into Goynes' Competence

A trial court must hold a sua sponte competence hearing when

> the trial judge receives information which,
> objectively considered, should reasonably have
> raised a doubt about defendant's competency
> and alerted him to the possibility that the
> defendant could neither understand the
> proceedings or appreciate their significance,
> nor rationally aid his attorney in his
> defense.

Lokos v. Capps, 625 F.2d 1258, 1261 (5th Cir. 1980) (internal quotations omitted).  The Supreme Court has identified three relevant factors:  the existence of a history of irrational behavior, the defendant's demeanor at trial, and prior medical opinion.  Drope, 420 U.S. at 180.

Goynes concedes that the trial court granted his pretrial motion for a psychiatric examination and that the subsequent examination, carried out at Vernon State Hospital, found that Goynes was competent to stand trial.  He nonetheless argues that

-18-

trial testimony concerning his impaired verbal abilities raised questions about his competence. Presumably, Goynes takes the position that this evidence should have led the trial court to order another examination.

While Goynes has a long history of mental illness, a psychiatric examination shortly before trial, conducted at Goynes' request, found that he was competent to stand trial. He points to no erratic behavior during trial indicating any change in his mental status between the examination and trial. Moreover, the testimony concerning Goynes' verbal limitations does not contradict the finding that he was competent. While Goynes' impairments may render him <u>less</u> <u>able</u> than some other defendants to assist in his defense, the evidence before the trial court was that they did not render him <u>unable</u> to do so. This evidence included a psychiatric examination undertaken specifically to determine Goynes' competence. Accordingly, there was no reason for the trial court to order a second psychiatric evaluation.

## B.   Ineffective Assistance of Appellate Counsel

As his Third Ground for Relief Goynes argues that he received ineffective assistance of appellate counsel because counsel failed to raise the issue of the trial court's failure to <u>sua</u> <u>sponte</u> conduct a competency hearing.

A defendant is constitutionally entitled to effective assistance of appellate counsel when he has a right to appeal under

state law.   _Evitts v. Lucey_, 469 U.S. 387, 395 (1985).   As
discussed above, the trial court did not err in failing to conduct
a _sua sponte_ inquiry into Goynes' competence.   Therefore, there was
no error for counsel to raise, and counsel's failure to raise a
meritless claim did not constitute deficient performance.   _See_,
_e.g._, _Sones v. Hargett_, 61 F.3d 410, 415 n.5 (5th Cir. 1995)
("Counsel cannot be deficient for failing to press a frivolous
point."); _Koch v. Puckett_, 907 F.2d 524, 527 (5th Cir. 1990) ("This
Court has made clear that counsel is not required to make futile
motions or objections.").

**C.   Penry**

During the penalty phase of Goynes' trial, the jury was
required to answer two statutory special issues:   (1) whether
Goynes committed the offense deliberately, and (2) whether there
was a probability that Goynes would commit future acts of criminal
violence making him a future danger to society.   Tex. Crim. Pro.
art. 37.071; SH. at 462.   The trial court instructed the jury that
it should simply answer "no" to one of the special issues if it
found that any mitigating evidence justified imposition of a life
sentence rather than a death sentence.   The Texas Court of Criminal
Appeals deemed this nullification instruction sufficient.   _Goynes_,
slip op. at 4.   For his Fourth Ground for Relief Goynes argues that
the punishment phase special issues did not allow the jury to
consider and give effect to his mitigating evidence.

-20-

In <u>Lockett v. Ohio</u>, 438 U.S. 586, 608 (1978), a plurality of the Supreme Court held "that the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record . . . as a basis for a sentence less than death."  438 U.S. at 604 (emphasis in original).   This holding is based on the plurality's conclusion that death "is so profoundly different from all other penalties" as to render "an individualized decision . . . essential in capital cases."   <u>Id</u>. at 605.

In <u>Penry v. Johnson</u>, 532 U.S. 782 (2001) ("<u>Penry II</u>"), the Supreme Court clarified that a capital sentencing jury must "be able to consider and *give effect to* a defendant's mitigating evidence in imposing sentence."   <u>Id</u>. at 797 (internal quotation marks, citation, and brackets omitted).   In Penry's trial the jury was given a nullification instruction substantially similar to the one in this case.   <u>Id</u>. at 789-90.   The Supreme Court found that there were two plausible interpretations of the instruction: First, it could be understood as instructing the jurors to *weigh* the mitigating evidence in determining its answer to each special issue.   <u>Id</u>. at 798.   The Court held, however, that none of the special issues were broad enough for the jury to give mitigating effect to the evidence of Penry's retardation and the abuse he suffered as a child.   <u>Id</u>.   For example, the jury could fully credit the mitigating evidence, believe it required a sentence less than death, but find that Penry's retardation actually made him <u>more</u>

<u>dangerous</u> in the future, thereby compelling a positive answer to the future dangerousness special issue. The Court found that a second plausible interpretation was that the jury could simply nullify, i.e., give a negative answer to a special issue that it actually found was supported by the evidence. <u>Id</u>. The Court found that this interpretation made the jury instructions "internally contradictory, and placed law-abiding jurors in an impossible situation." <u>Id</u>. The Court therefore concluded that the instructions injected an element of capriciousness into the sentencing decision. <u>Id.</u> at 800.

Goynes' sentencing proceeding suffered from the same flaw. Unlike Penry, Goynes is not retarded. He does, however, have very low intelligence and a long history of mental illness. Due process requires that the jury have an opportunity to give effect to this mitigating evidence. "Evidence of significantly impaired intellectual functioning is obviously evidence that might serve as a basis for a sentence less than death." <u>Tennard v. Dretke</u>, 542 U.S. ___, 124 S.Ct. 2562, 2572 (2004); <u>see also</u> <u>Smith v. Texas</u>, 543 U.S. ___, ___ S.Ct. ___ (2004) (same). Yet, as in Penry's case, Goynes' jury could have found that the evidence of Goynes' low IQ and history of mental illness made Goynes less morally culpable, yet more likely to be dangerous in the future. Therefore, as in Penry's case, this evidence would compel an honest jury to answer "yes" to the future dangerousness special issue, while providing no avenue for the jury to give the evidence mitigating value. Similarly, the jury could

have found that Goynes acted deliberately while still believing him less culpable based on his mental problems.  These special issues, coupled with the nullification instruction, therefore violated Goynes' right to due process because the jury had no opportunity to give effect to Goynes' mitigating evidence.

The Texas Court of Criminal Appeals' decision to the contrary was objectively unreasonable.  As Dretke concedes, the Court of Criminal Appeals declined to evaluate the mitigating evidence and instead "held that the supplemental instruction was adequate to avoid the constitutional infirmity condemned by *Penry I* [492 U.S. 302 (1989)]."  Resp. Br. at 56 (internal quotation marks omitted). The supplemental "nullification" instruction, however, was plainly <u>inadequate</u> to avoid the constitutional infirmity condemned by <u>Penry I</u>, as is made abundantly clear by the Supreme Court's subsequent decision in <u>Penry II</u>.  This is not an issue about which reasonable jurists could disagree; the nullification instruction approved by the Court of Criminal Appeals did nothing to permit jurors to give effect to mitigating evidence that does not specifically negate one of the statutory special issues.  As <u>Penry II</u>, <u>Tennard</u>, and <u>Smith</u> all make clear, this is unacceptable. The Court of Criminal Appeals' opinion to the contrary was therefore unreasonable.[3]

_____

[3]Dretke also argues, relying on Fifth Circuit precedent, that Goynes is not entitled to relief because there was no nexus between his mental illness and his crime.  The Supreme Court squarely
(continued...)

**D.   Goynes' Confession**

In his Fifth through Seventh Grounds for Relief Goynes challenges the admissibility of his confession.  He argues that his confession was elicited after he asked to terminate the interrogation (Ground Five); that he did not knowingly and voluntarily waive his Fifth Amendment rights (Ground Six); and that his confession was involuntary (Ground Seven).

1.   <u>Request to Terminate the Interview</u>

If a suspect "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." <u>Miranda v. Arizona</u>, 384 U.S. 436, 473-74 (1966); <u>see</u> <u>also</u> <u>Michigan v. Mosley</u>, 423 U.S. 96, 101 (1975). Goynes' petition, however, does not point to any specific place in the record indicating that he ever asked to terminate the interview.

In his direct appeal Goynes argued that there were three places where he asked to terminate the interview.  First, Goynes was asked if he understood his rights.  The interviewer understood Goynes to respond that he did understand his rights, but Goynes' expert audiologist, Dr. Yanovitz, testified that Goynes actually answered "no," indicating that he did not understand his rights.

---

[3](...continued)
rejected this "nexus" requirement in <u>Tennard</u> and <u>Smith</u>.  "We rejected the Fifth Circuit's "nexus" requirement in <u>Tennard</u> . . . ." <u>Smith</u>, 543 U.S. at ___, ___ S. Ct. at ___.

The Court of Criminal Appeals concluded that this exchange had nothing to do with terminating the interview.

The second instance was in response to the question "[a]re you willing to waive your rights so that we can discuss why you're here today, why you're arrested." The transcript of the interview records Goynes answering "I want to discuss it." Dr. Yanovitz concluded from the tape that Goynes actually said "I don't want to discuss it." The interviewer then tried to clarify, asking Goynes "[y]ou want to discuss it? You're gonna have to speak up, Theodore, Okay?" Goynes replied: "Yeah." The Court of Criminal Appeals concluded that the officer did not understand Goynes' original response and, when he tried to clarify the answer, Goynes indicated that he was willing to continue the interview.

The Court of Criminal Appeals also found no request to terminate the interview in the final section cited by Goynes:

Q: Did you talk to your mother or sister last night?

A: Uh.

Q: Did you know we were looking for you?

A: Uh.

Q: Okay, Theodore, we're gonna, well I think I'm gonna go ahead and, do you have anything else to say about it?

A: No.

The interview then continued. The Court of Criminal Appeals concluded that Goynes simply answered that he had nothing further

to add to what he already said, but did not ask to terminate the interview.  <u>Goynes</u>, slip op. at 9-11.

Of the three sections of the interview cited, the only one in which Goynes arguably asks to terminate the interview is the passage in which the interviewer understood him to say "I want to discuss it," but Dr. Yanovitz concluded that he said he did not want to discuss it.  It is clear from the followup question, however, that the interviewer was unable to understand Goynes' response because Goynes was speaking too softly, and asked Goynes to clarify.  Goynes then indicated that he wanted to continue.

The Court of Criminal Appeals' conclusion that Goynes never asked to terminate the interview was reasonable.  The  finding is therefore entitled to deference under the AEDPA, and Goynes is not entitled to relief on this claim.

### 2.   <u>Knowing and Voluntary Waiver of Rights</u>

In his Sixth Ground for Relief Goynes contends that he did not knowingly and voluntarily waive his Fifth Amendment rights because he lacked the mental capacity to do so.  This claim is procedurally defaulted.

Goynes raised this claim on direct appeal.  The Court of Criminal Appeals held that the claim was defaulted because it was inadequately briefed.  <u>Goynes v. State</u>, slip op. at 11-12.

The procedural default doctrine may bar federal review of a claim.  "When a state court declines to hear a prisoner's federal

-26-

claims because the prisoner failed to fulfill a state procedural requirement, federal habeas is generally barred if the state procedural rule is independent and adequate to support the judgment." <u>Sayre v. Anderson</u>, 238 F.3d 631, 634 (5th Cir. 2001). The Supreme Court has noted that

> [i]n all cases in which a state prisoner had defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

<u>Coleman v. Thompson</u>, 501 U.S. 722, 750 (1991). "This doctrine ensures that federal courts give proper respect to state procedural rules." <u>Glover v. Cain</u>, 128 F.3d 900, 902 (5th Cir. 1997), <u>cert. denied</u>, 523 U.S. 1125 (1998) (citing <u>Coleman</u>, 501 U.S. at 750-51); <u>see also</u> <u>Edwards v. Carpenter</u>, 529 U.S. 446, 451 (2000) (finding the cause and prejudice standard to be "grounded in concerns of comity and federalism"). Therefore, this claim is procedurally defaulted, and this court may not consider its merits unless Goynes can show cause and prejudice or that this court's failure to consider the claim will result in a fundamental miscarriage of justice.

"Cause" for a procedural default requires a showing that some objective factor external to the defense impeded counsel's efforts

-27-

to comply with the state procedural rule or a showing of a prior determination of ineffective assistance of counsel.  Murray v. Carrier, 477 U.S. 478, 488 (1986); Amadeo v. Zant, 486 U.S. 214, 222 (1988).  Goynes identifies no such external factor.[4]  He therefore fails to demonstrate cause for his default.

A "miscarriage of justice" means actual innocence, either of the crime for which he was convicted or of the death penalty. Sawyer v. Whitley, 505 U.S. 333, 335 (1992).  "Actual innocence of the death penalty" means that, but for a constitutional error, he would not have been legally eligible for a sentence of death.  Id.

To show actual innocence,

[T]he prisoner must 'show a fair probability that, in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after trial, the trier of the facts would have entertained a reasonable doubt of his guilt.

Kuhlmann v. Wilson, 477 U.S. 436, 455 n.17 (1986).  Goynes does not contend that he is actually innocent of either capital murder or the death penalty.  Therefore, this claim is procedurally defaulted.

---

[4]The only instance of ineffective assistance of appellate counsel Goynes alleges pertains to counsel's failure to raise the issue of the lack of a sua sponte competency hearing; Goynes does not allege that appellate counsel was ineffective for failing to argue that Goynes did not validly waive his Miranda rights.

3.   <u>Voluntariness of Goynes' Confession</u>

For his Seventh Ground for Relief, Goynes argues that his confession was not voluntary. While he points to no specifically coercive action by the police, Goynes seems to imply that his confession was involuntary because he lacked the mental capacity to make a voluntary confession, and because the police questioned him in a manner intended to prey on his low verbal ability.

The trial court held a pretrial suppression hearing and concluded that Goynes' confession was admissible. During the hearing Houston Police Sergeant Johnny Moore testified that he advised Goynes of his <u>Miranda</u> rights before questioning him. In response to questions, Goynes admitted abducting Tucker to take her for a "joy ride." Moore admitted asking leading questions because Goynes did not respond to questions in a narrative fashion.

Dr. Yanovitz testified that Moore employed a style of "requisitive questioning" in which Moore asked multiple questions before pausing to allow Goynes to respond. Yanovitz testified that Moore asked 293 questions but paused only 82 times. Moore's questions also contained "backchannel information," which was not intended to receive information, but to confirm that Goynes was paying attention. 7 Tr. at 93-105.

Dr. Jerome Brown, a clinical psychologist, testified that due to Goynes' limited intelligence Goynes could become confused by multiple questions. Goynes is more able to answer single "yes/no" questions.

On direct appeal the Texas Court of Criminal Appeals found nothing coercive in the interrogation methods employed by the police. That court found that Moore's use of leading questions was appropriate because Goynes was unable to give narrative responses, and that the police meticulously respected Goynes' rights by calling him an attorney even after he waived his rights and by terminating the interview when Goynes so requested. Goynes v. State, slip op. at 12-15.

Goynes' mental status, by itself, cannot render his confession involuntary. "Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." Colorado v. Connelly, 479 U.S. 157, 164 (1986). While Goynes' mental status is a factor to consider, id., he still must demonstrate some coercive police conduct.

Goynes identifies no coercive conduct by the police. As the Texas Court of Criminal Appeals noted, the use of leading questions was necessary because Goynes could not answer questions in narrative form. While Goynes suggests that Moore's use of multiple questions confused him, there is nothing about this technique that is likely to overcome Goynes' will. The combination of the questioning technique and Goynes' low intellect may call into question whether Goynes was confused, and thus the reliability of Goynes' confession, but it does not raise any issue about the

<u>voluntariness</u> of the confession.   Goynes was free to raise questions about the reliability of his statements during trial, and he did so.   With the knowledge that Goynes may have been confused by the questions, it was then up to the jury to determine how much, if any, weight the confession should carry.   In the absence of any evidence that the confession was involuntary, however, Goynes is not entitled to habeas relief on this claim.

**E.   Ineffective Assistance of Trial Counsel**

In his Eighth and Ninth Grounds for Relief, Goynes contends that his trial counsel was ineffective for failing to investigate evidence of Goynes' organic brain damage for the purposes of using it as mitigating evidence (Ground Eight) and to challenge the voluntariness of his confession (Ground Nine).   These claims are procedurally defaulted.

Goynes acknowledges that he never raised these ineffective assistance of counsel claims in his state habeas corpus petition. *See* Petition at 2-3.   He cites no cause for this default and, as discussed above, he makes no claim that he is actually innocent either of capital murder or of the death penalty.   Therefore, this court cannot review these two claims.

## IV.   <u>Certificate of Appealability</u>

Goynes has not requested a certificate of appealability ("COA"), but this court may determine whether he is entitled to

this relief in light of the foregoing rulings.  See Alexander v. Johnson, 211 F.3d 895, 898 (5th Cir. 2000) ("It is perfectly lawful for district court's [sic] to deny a COA sua sponte.  The statute does not require that a petitioner move for a COA; it merely states that an appeal may not be taken without a certificate of appealability having been issued.").  A petitioner may obtain a COA either from the district court or an appellate court, but an appellate court will not consider a petitioner's request for a COA until the district court has denied such a request.  See Whitehead v. Johnson, 157 F.3d 384, 388 (5th Cir. 1988); see also Hill v. Johnson, 114 F.3d 78, 82 (5th Cir. 1997) ("[T]he district court should continue to review COA requests before the court of appeals does.").  "A plain reading of the AEDPA compels the conclusion that COAs are granted on an issue-by-issue basis, thereby limiting appellate review to those issues alone." Lackey v. Johnson, 116 F.3d 149, 151 (5th Cir. 1997).

A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); see also United States v. Kimler, 150 F.3d 429, 431 (5th Cir. 1998).  A petitioner "makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further." Hernandez v. Johnson,

-32-

213 F.3d 243, 248 (5th Cir.), <u>cert. denied</u>, 531 U.S. 966 (2000).

The Supreme Court has stated that

> Where a district court has rejected the
> constitutional claims on the merits, the
> showing required to satisfy § 2253(c) is
> straightforward: The petitioner must demon-
> strate that reasonable jurists would find the
> district court's assessment of the constitu-
> tional claims debatable or wrong.  The issue
> becomes somewhat more complicated where . . .
> the district court dismisses the petition
> based on procedural grounds.  We hold as
> follows:  When the district court denies a
> habeas petition on procedural grounds without
> reaching the prisoner's underlying constitu-
> tional claim, a COA should issue when the
> prisoner shows, at least, that jurists of
> reason would find it debatable whether the
> petition states a valid claim of the denial of
> a constitutional right and that jurists of
> reason would find it debatable whether the
> district court was correct in its procedural
> ruling.

<u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).  "[T]he determination of whether a COA should issue must be made by viewing the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)."  <u>Barrientes v. Johnson</u>, 221 F.3d 741, 772 (5th Cir. 2000), <u>cert. dismissed</u>, 531 U.S. 1134 (2001).

This court has carefully considered each of Goynes' claims. While the issues Goynes raises are clearly important and deserving of close scrutiny, this court concludes that each of the claims except for his <u>Penry</u> claim is foreclosed by clear, binding precedent.  This court concludes that under such precedents, Goynes has failed to make a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  As to those claims

-33-

that have been dismissed on procedural grounds, this court
concludes that jurists of reason would not find it debatable
whether the petition states valid grounds for relief and would not
find it debatable whether this court is correct in its procedural
determinations. This court concludes that Goynes is not entitled
to a certificate of appealability on his claims.

### V.   Conclusion and Order

For the foregoing reasons, it is **ORDERED** as follows:

1.   Respondent Doug Dretke's Motion for Summary Judgment
     (Document Entry No. 32) is **GRANTED IN PART**, and Goynes'
     First through Third and Fifth through Ninth Grounds for
     Relief are **DISMISSED**;

2.   Dretke's Motion for Summary Judgment is **DENIED** as to
     Goynes' Fourth Ground for Relief;

3.   Petitioner Theodore Goynes' Supplemental Petition for
     Writ of Habeas Corpus (Document Entry No. 23) is **GRANTED
     IN PART** as to the Fourth Ground for Relief;

4.   A writ of habeas corpus shall issue directing respondent
     to release Goynes from custody unless, within 120 days of
     the entry of final judgment in this case, the State of
     Texas grants Goynes a new sentencing hearing;

5.   No Certificate of Appealability shall issue in this case;
     and

6.   Final judgment will be entered by separate order.

**SIGNED** at Houston, Texas, on this 30th day of November, 2004.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE

-34-